Good afternoon. Jagdeep Singh Seku on behalf of the Petitioner v. Ledacircu. Your Honors, in this case, the Petitioner v. Ledacircu has suffered past persecution, that is the finding by the agency, and as a result, she statutorily qualifies as a refugee. Because she qualifies as a refugee, she is entitled to a couple of very significant legal presumptions. The first legal presumption she is entitled to is that she has a country-wide fear of persecution in Romania. The second legal presumption she is entitled to is that even assuming that she could relocate in Romania, it would be unreasonable to expect her to The combination of these presumptions translates into a presumption that she is statutorily eligible for asylum. The government, of course, has the opportunity to rebut these presumptions at a hearing if the government establishes that there has been a fundamental change in circumstances such that Ms. Seku no longer has a well-founded fear of persecution, or in the alternative, the government can establish that it is reasonable to expect her to safely relocate. Like every other dimension of an asylum adjudication, these issues are to unfold at a full and fair hearing, where Ms. Seku would have the opportunity to challenge the reliability of rebuttal evidence and also have the opportunity to counter any rebuttal evidence. I have found two differences between 1999 and the 1997 version. One of those differences being the fact that the 1997 version talks about governmental and societal harassment of minority religious, whereas the 1999 version only talks in terms of it being still residual societal harassment. That's kind of a difference, isn't it? Yes, Janet. The other difference has to do, on the political side, with national politics versus local policies. Are there other differences like this? That's my first question. And the second part of it is, in your own words, you could explain why those two differences matter. Yes, Senator. Those are the pivotal differences that we focused on. And, of course, the fact that government is involved in persecution, or the State Department recognizes it, is important because Ms. Seku has suffered persecution at the hands of the government and was suffering harm at the hands of a government official at the time she left. So that is why it's significant that there is government participation. The first paragraph on freedom of religion in 1999 talks about low-level government officials who are unorthodox. And so does the 1997 one. Is that right? Yes, Janet. The 1999 report doesn't exclude government harassment of religious minorities, but as Judge Reimer pointed out, it's not in the introduction. In the introduction of the 1997 report, it's expressly stated that governmental harassment of religious minorities is a serious human rights problem. In the 1999 report, in the latter report, there's some discussion of it, notably in the county where Ms. Seku resided, in DeBrasov County, but it's not in the introduction. So I guess we could, if it's not in the introduction, I don't know how meaningful that is, but there is some discussion, yes, in the 1999 report about governmental harassment too, but it's not stated in the introduction. In the introduction, they only talk about societal harassment. Well, Your Honor, without conceding, our position is that the 1999 report standing alone wouldn't have been enough to rebut her well-founded fear of persecution. I think that there are a lot of reasons why we could take that position, but you're right, the fundamental issue is why she wasn't allowed to rebut the 1999 report, and it matters precisely because of that. For example, the IJ found that her well-founded fear of persecution was rebutted, but because she wasn't allowed to have a full and fair hearing, she wasn't allowed to bring up issues that we're talking about right now. For example, what is the weight of the fact that government officials in Brasov, the county that she resided in, went in and forced, I think it was Greek Catholics, out of their church, and why that was relevant to her case? And our position is that there is continuing harassment of religious minorities that does not constitute a fundamental change of circumstances that, if applied to her situation, doesn't rebut her well-founded fear of persecution. Do you agree that the IJ assessment, the 1999 report, just standing by itself, we're hearing about the 1999 report, is supported by substantial evidence? No, Your Honor, we don't agree. We believe that even her analysis is incorrect with respect to the 1999 report. Again, I have to state that there is governmental harassment of religious minorities in Ms. Serkou's county. So, under the law of this circuit, when the very type of fear the applicant fears is continuing, then that is not enough to rebut a refugee's well-founded fear of persecution. Is her claim only now reduced to religious persecution? Does she have any claim of political persecution? Yes, Your Honor, she does have a political persecution. Although, in this situation, in Romania, maybe the distinction between religious persecution and political persecution is really a distinction without a difference. To focus my question, there was evidence regarding her article that she was the prior former government of atrocities. The IJ rejected her status in that regard. She wasn't like the journalists that we talked about otherwise. So, are we focused here essentially on her Pentecostal status, that's her religion, or are you also trying to go into the 1999 report to talk about any attitudes, lingering attitudes, that are tied into the religion? Yes, Your Honor. We have two claims. First, that she does have a continuing well-founded fear of persecution based on religion, and that her opposition to government corruption constitutes a fear of persecution on account of her religion, and that the government was about the government atrocities during the communist regime, that suppressing her desire to do that is a suppression of her political opinion. Can I ask you why you didn't rebut the 1999 report in your appeal to the BIA? Your Honor, that would have been an inappropriate forum for us to, Ms. Zirkle, to submit evidence before the BIA. Ms. Zirkle raised the issue through her appeal on a request for remand that raises legal issues. She is not entitled to submit evidence in support of an appeal to the BIA. At that point in time, she might have decided to do that at her own peril. The BIA may have decided to consider it or not, that once she raised the issue as a constitutional issue on her appeal to the BIA, for her to recast that issue as a motion to remand would be recasting constitutional violation as an issue of discretion. Ultimately, she adequately raised the issue for the BIA. She exhausted her administrative remedies, and it was ill-advised for them to file a collateral motion that would have been considered something as a matter of discretion for the BIA to consider. Counsel, help me understand the prejudice aspect. In Castillo-Viagra, what we held was that it was a violation of due process for the BIA to rely on a country report that had not been introduced during the hearing before the IJ. We said the prejudice was that the petitioner might have been able to show that even though Violeta Chamorro had replaced the Sandinista government, nevertheless, the Sandinista control, the police and the military, and a lot of people in the party would have still maintained the persecution. What sort of showing does the record make plausible here that could have been made had she been given a fair chance to confront the 99 report? Yeah, if, if Maris Turku was afforded the opportunity to present evidence, she could have presented evidence such as that the experiences of the Greek Catholics in Brasov wasn't isolated to the Greek Catholics, that the societal harassment and evidence of government harassment in the 1999 report extended to other religious minorities, including the Pentecostals. She could have further established that the issue in Romania with respect to whether or not Romania should confront its past was a political issue that concerned the government. And she could have also presented evidence of why of religious minorities continuing to be the police abuses that are rampant. In other words, she could have established that religious minorities are still more at risk than the rest of the population with respect to the police abuses that is very well documented in the report. Is Ms. Turku particularly well known individually or does her family stand out amongst Pentecostals? Does she have some extraordinary position in her area that would cause her to be singled out more than perhaps even other Pentecostals? Well, Your Honor, that was Ms. Turku's testimony that in her area, her family was very well known. Her grandfather was persecuted because he was a Pentecostal. Her father was persecuted because he's a Pentecostal secured refugee status in the United States. Her mother was persecuted because she was a Pentecostal, was a grand asylum in the United States. Ms. Turku, her brother was abducted by the Romanian authorities, was detained in a hospital for three years and then died in the hospital before it never was returned to the family. So Ms. Turku's testimony, which was found credible, was that in her county she was known, her family was known to have suffered past persecution as a Pentecostal family, that they were known to have a conflict with the authorities and that was one of the reasons why this police official was focusing on her and targeting her. Can I rephrase the Prince's question a bit? If you put the 1999 country conditions report aside, altogether, was there substantial evidence to support the IJ's determination of changed country conditions based solely on 1997? Absolutely not, Your Honor. I think the IJ said no, there wasn't enough, because there were two 1997 reports, Your Honor. One of them did discuss harassment of Pentecostals as continuing, although it said, they've been, quote, marred occasionally by some harassment. And then of the ninth, the end, the department, the country reports on human rights practices did identify governmental harassment of religious minorities as a serious human rights problem. And then in the section that was delineated as the religious minority section, in that there's a discussion about religious minorities not being able to worship and being particularly targeted by government authorities. So when we have the continuing human rights violations, similar to what the applicant fears, that never is enough to rebut well-founded fear of persecution. This is why I'm having trouble seeing why the 1999 report itself is not a sufficient basis for regarding the IJ's opinion as not based on substantial evidence, because the 1999 report says that several denominations continue to make credible allegations that low-level government officials at Romanian Orthodox communities continue to be represented as proselytizing. The press reported several instances where adherents of minority religions have committed a religion and local law enforcement did not protect them. There's no particular mention of Pentecostals, but the statement itself calls for a general statement. So, Your Honor, can we just go to the last one? I don't think, Your Honor, we do want to maintain our position that the 1999 report was not enough either, but I think the court has restricted... But the main difference between 1997 when it mentions Pentecostals and minority Protestant communities in particular is that it has this one incident about the Baptist thing. Yeah, the main difference... It's the specificity of it that's really the difference, not really the overall message. Your Honor, again, that's why these country reports are so tricky, because they are, you know, snapshots of a country, and the Seventh Circuit has pretty much categorically said you can't just rebut a well-founded fear of persecution based on a country report. But, yes, Your Honor, if we were to really start sparsing out and trying to find the differences, the differences were, as Judge Reimer identified, you know, little differences in the use of language, but significant enough that Ms. Sirku was prejudiced by not having the ability to rebut the 1999 report. Your Honor, I would like to discuss just a little bit DiJay's analysis here with respect to her, I think, artificially dividing Ms. Sirku's persecution claim into pre-Chichescu and post-Chichescu. When she discusses Ms. Sirku's persecution, she really doesn't discuss what happened to her after the fall of the Chichescu regime, and she did have significant experiences after 1990, including the sexual violence she suffered at the police station, the harassment that the police officer continued to subject her to, the expulsion from the university, the 1994 police summons that followed. And then when the IJA finally does turn her attention to that, she kind of transmutes everything into a relocation analysis, and the relocation analysis, of course, is different. Relocation analysis says, okay, well, we're going to assume the And in the relocation analysis, the IJA never ever considered reasonableness, and reasonableness is something that the IJA is required to consider, whether or not it's reasonable to expect the applicant to relocate. And there's some issues with respect to reasonableness that are really relevant in this case. The fact that Ms. Sirku's family is in the United States, the fact that violence against women seems like an endemic problem in Romania, and the fact that social harassment is still admittedly a problem, social harassment of religious minorities is admittedly a problem in Romania. So even if we were to, if there's some evidence to support the finding that Ms. Sirku's problems were really limited to Brasov, nevertheless, she'd be still entitled to a reasonableness analysis with respect to whether or not it's reasonable to expect her to relocate. I'm going to reserve the rest of my time for rebuttal. Thank you. Margaret Perry Good afternoon, Margaret Perry for the government. There are two issues before the court in regard to this issue of administrative notice. The first issue is whether there was error under Ninth Circuit law in the immigration judge taking administrative notice, and there's only error under Ninth Circuit law if Ms. Sirku had no notice of that or reasonable opportunity to respond. So the question is, did she have notice at the IJ, took notice of these additional facts, and did she have reasonable opportunity to respond? If and only if the answer to that is no, she did not have adequate notice, no, she did not have reasonable opportunity to respond, do you get to? The notice was, as the panel decision in this case correctly stated, the notice was when the immigration judge announced in his decision, here are facts in the 99 report of which I'm taking notice. She got, by virtue of him stating that in his decision, that gave her notice that he had done so. She then had, then the issue becomes, does she have a reasonable opportunity to contest and rebut that? And she does by virtue of her de novo appeal to the board. Well, the notice before you make a decision isn't very good notice. Well, the case law of this court is, in Castillo-Villegra, that administrative notice is not per se illegal. Certainly it's not when the facts that are noticed are legislative facts that are not disputed, right? The problem here is that her decision turns on something that's not in evidence. It's not in the administrative record. And this court has held, and rightly so, that that is only error if she has no reasonable opportunity to contest or rebut those facts. Counsel, in Castillo-Villegra, what we said was she should have a chance before the decision is made in her case to deal with the changed conditions in the report and show how it affected her. And what I don't understand is why the government did not ask the BIA to remand or ask the IJ to reopen as soon as the IJ came out with his decision. The IJ decided the case based on something that did not exist when the hearing was held. I would think it would be incumbent on the government to say to the IJ, Your Honor, we request that you reopen the record in order to eliminate any due process concerns by giving Circo a chance to confront the 99 report and show how these changes affect or don't affect her. Well, with all due respect, Your Honor, what this court said in Castillo-Villegra was that there can be no final agency decision denying asylum based on noticed facts of which an alien did not have notice and reasonable opportunity to respond. Three elements, final agency decision, notice. You might have reversed in Castillo-Villegra because she never got a chance in front of the IJ to show how the change in the Nicaraguan government affected or didn't affect her. In that case, it was the BIA that took notice for the first time on appeal. And most of the cases dealing with administrative notice, you see deal with the board, which is the final agency decision maker, taking administrative notice for the first time on appeal and then announcing it in its decision so that the alien in that situation has not had notice or opportunity to rebut. Let me just understand what your position would mean administratively. It would mean that the IJ couldn't issue a decision and that post-hearing the IJ can consider anything that the IJ might deem appropriate. And then the petitioner's only recourse is to hope that if they put a rebuttal in an appeal to the board that the board would then consider it, which the board is not required to do. I mean, you would basically, my concern is you basically turn every board appeal into a trial. And that's not the same as de novo review on the record. Well, again, with all due respect, Your Honor, but again, the controlling principle of law here is an issue of due process, right? Fundamental fairness. And this court has repeatedly said that that involves reasonable notice and opportunity to respond, correct? And in other contexts it has held that when the IJ does something wrong, for instance, in a case called Galley, which is a decision of this court where the IJ refused to permit someone to rebut a Department of State report by extra exhibits, this court held that the appeal to the board with its de novo review was certainly adequate remedy and made that error harmless. How do we know the board here? Because it's basically affirmance without opinion. So the issue raised, the constitutional due process and the concern about this, we have no idea that the board took it into consideration and said, you know what? It doesn't matter because I'm de novo. Because in fact, we're actually shunted back to the IJ procedurally. So your argument doesn't work in this new world of decisions without opinion, does it? Well, it does work in this particular case because in order for the board to have done what it did under its regulations, it could only issue that affirmance without opinion under the regulation and is directed to do so only if it finds there was either no error or any error was there. The BIA says the decision below, therefore, is the final agency determination. For purposes of articulation for and what the ultimate outcome is. And as this court said in Creech, ordinarily for purposes of judicial review so that you have an articulated agency decision to review. Here we have this situation where they've raised, I'm sorry. Then we're reviewing the IJ decision. That's what the regulation says we're supposed to be doing. If we do that, we have no indication that anybody ever was given the opportunity to do anything else. Well, this court has said in its decision in Cham that in certain circumstances, it can review the board's decision to streamline and take that into account and see if it met its criteria. I'm getting the impression from what you're saying is that Mr. Koo did something, you feel she did something wrong, that she had the opportunity and she didn't do something and didn't act on it. So what, I mean, what did she need to do to be heard here? That's what she needed to do. Because, you know, anyone knows once a judge makes a decision, and any lawyer would much rather be able to say what they say before the judge makes the decision instead of trying to change the judge's mind. So here it's already made. So you're pushing the rock uphill as it is. But what was the, I just have the impression you're saying there's something she should have done that she didn't do here. Well, she did in fact do what she needed to do. She appealed to the board. She said it was error. I feel I was harmed. I haven't had an opportunity to contest a rebut. I should have that. I think you should either remand to let me contest a rebut, which she said in her brief, and in her notice to appeal, she actually did rebut because she said she addressed the 99 report, and she gave several examples of why she thought it was not sufficient to rebut the change country conditions. So she utilized the board appeal exactly as she should, which was to say that this was error, that she was prejudiced or harmed by it, and most importantly to rebut or contest the taking of administrative notice and rebut the facts noticed in the 99 report. The board under its regulations, then, has at this time... The fact was facts, and that usually means submitting evidence. In this case, it was somewhat unusual in that she did submit a great deal of evidence before the IJ, very specific evidence, and she was, as I understand it in her brief, asking for the opportunity to do that in response to the 1999 report. She didn't have that opportunity. So what, again, to paraphrase Judge Kalman, what was she supposed to do? Well, I guess the question is, and perhaps we have a difference in... Maybe we need to clarify because maybe... The law is that you must have reasonable opportunity to rebut, correct? It doesn't mean that you must take that opportunity, but that the system must afford it. Here she had a de novo appeal with the board able to review any arguments that she made as to why the 99 report did not... You're saying it was a de novo review because of its timing. Now, for sure, she couldn't introduce any facts before the board. Do you think she could have then? Is that what you're saying? Is that why you're saying it's a de novo review? Well, she did not introduce additional evidence to rebut. Is that correct? She could have, though. I thought the rules prohibited her from introducing evidence on her appeal to the BIA. I'm sorry, what did you say, Ted? Don't the rules prohibit her from introducing evidence before the BIA that was not in the record prior to that? Well, if you look at the en banc decision of this court in Ramirez Alejandro, which deals with the rules of the board at this time, makes very clear that, in fact, the board at this time was not a purely appellate body, that it did, in fact, have the authority to consider new evidence on appeal. And the second decision of yours that you can look at is a recent decision called Narayan, in which they talk about the submission of new evidence while an appeal is pending, and they said the rule at the board is, and was during this time, is stated in matter of Calejo, which is as follows. You can submit new evidence on appeal to the board, and it will be considered via a motion to remand or reopen, and it will be considered and can be considered if it pertains to the issues you are raising in your appeal. Doesn't the Ordonez case say that the BIA's practice in this respect has been schizophrenic and counsel can be excused for not submitting new evidence to the board? Well, I know that this court in its en banc decision in Ramirez Alejandro said that the board had had conflicting positions about this, but that doesn't mean that the opportunity did not exist. There were certainly published cases out there. Doesn't the Ordonez case essentially say counsel could be excused for not figuring out which way the board was going at that time? The regulations are now new regulations that were in effect at the time. Well, and certainly now there are new regulations that clarify, as this court asked the board to do in Ramirez Alejandro, that the proper procedure under the rules now is to make a motion to remand, which the board will consider, and if there is to be new evidence taken, it will remand. However, the point is, was the system that was created, did it create adequate opportunities for her to contest the administrative notice? Yes, it did via her appeal, which she exercised, and she did indeed contest it, not only the taking of it, but then argued against points in her notice of appeal that were in the 99 report, and if she wanted to go further and introduce new opportunity, too. Counsel, she wasn't allowed to introduce the new evidence. Your argument seems to be that the board could take new evidence if she asked, and that it's like a motion to reopen. We held in Castillo Viagra that a motion to reopen is not a jurisdictional prerequisite and is not a prudential prerequisite for, in the nature of exhaustion of administrative remedies, we would review and reverse anyway, because a motion to reopen is discretionary and disfavored, and under the due process clause, the petitioner had a right, not merely a discretionary opportunity, to introduce two arguments here. One, that she had an opportunity, and that's precluded by Castillo Viagra, and the other is that Castillo Viagra should be distinguished, because that was about the BIA taking notice, and this is about the IJ taking notice, and that seems to be precluded by the BIA. I don't see where the room is. With all due respect, Judge, I think we're talking, there are two different kinds of motions to reopen, and I think we, perhaps it will clarify if I can explain the procedures here in Castillo Viagra. In Castillo Viagra, an alien from Nicaragua, who was an Andes Sandinista, had a hearing before an immigration judge, claiming she feared persecution by the Sandinista government. The IJ said no persecution or well-founded fear. She then appealed to the IJ decision, and her appeal to the board, the Sandinista government was ousted. The board, on appeal, took administrative notice, for the first time in that case, that the Sandinista government had been ousted, that there was a new president, and then it made certain conclusions, also saying that this showed she didn't have a well-founded fear. All of this was done, and this is, I think, critical to remember, by the board, on appeal, with no notice to the alien, or opportunity to rebut or respond, before the board issued the final administrative notice, that was the closure of the administrative proceedings. What this court said was, that is not fundamentally fair or reasonable, because she hasn't had notice or opportunity to respond. And the court pointed out that other circuits had rejected the Ninth motion to reopen, which is one type of motion to reopen that they can make, asking the board to go back and reconsider its administrative notice, so that, because it was, because the alien wants to rebut it, or the facts noticed could be rebutted, this court held, while other circuits have held that's an adequate remedy, we do not so hold, because that type of post-final decision motion to reopen or reconsider, to re-examine the administrative notice, is purely discretionary, the alien can't get a stay of removal or deportation, and we don't think that's an adequate remedy. That's not the type of motion I'm talking about here, with all due respect, Your Honor. If you read the Narayan decision, which is a 2004 decision, discussing matter of Callejo, and Ramirez Alejandro, what we're talking about is a different stage in the board, raising a particular issue. In this case, she's saying to the board on appeal, I object to the administrative notice of this 99 report and the facts that the IJ noticed, I want an opportunity to rebut, and this is why, she said in her notice of appeal, this is why that report does not rebut the showing of past persecution, and she lists several things shown in that 99 report. Counsel, how do we review what the BIA did with that? Isn't that what the critical question is? And the answer is, you don't have an articulated agency decision saying that, correct? In fact, our law is that we don't review it at all when we do that, we go back and review the IJ. You also have case law that says, however, that there is a presumption of regularity, you have case law that says you will review the board's decision if it raises unusual or novel issues, and you can look to see whether the case is properly streamlined. I'm sorry, it's a little hard for me to... What we do in that instance is we reverse it on the ground and remand on the ground. I don't know of an instance in which we have reviewed the board's non-decision on the merits, all we have done is occasionally said that this isn't meeting the criteria for streamlining, don't do it again in a non-streamlined fashion. And you've reversed and remanded for them to articulate a decision. If that's what you want to do, our position is, however, that in this case, if you were to review the streamlining criteria, as you say, to see if they complied with it, the question would be, was there error under Ninth Circuit law, meaning was there administrative notice taken without any notice or reasonable opportunity to rebut, and was there prejudice? If not, was the error harmless? That's the very inquiry the board had to make to streamline, that is the inquiry you have to make on the merits, and they collapse, and so to remand to the board to articulate exactly what in this is your scope of review is to remand for redundancy. Let's go to the prejudice issue then. If you were to ignore the 1999 report, what is the evidence to support the administrative law judge's conclusion with respect to the lack of religious persecution at that time with respect to Pentecostal? Well, it's the same, it's the government's position that it's, I don't think how to answer this, it is the same with or without the 1999 report, because if you read the IJ's decision and the particular facts he stated he was noticing in the 99 report. I think it's a woman. She, sorry, you're right, thank you. She, that she said she, if you go through her decision and see each of the facts she said she was noticing from the in two to three of each of the other reports that were already in the record, so the facts that she noticed from the 1990 report are entirely duplicative of facts that were already in the record, so. In the first statement that begins on page nine, the January 1997 profile of country conditions issued by the Department of State states that Pentecostals and other unregistered sects had been in Romania the whole time. However, the 1999 report indicates that open worship is not possible. So the IJ herself drew a distinction between the 1997 and 1999 reports. Yes, and of course that is the paragraph that Judge Hawkins in his dissent highlighted to say this paragraph, if nothing else, shows that the 1990 report must have materially affected the outcome here. And my answer to that is that if you go to page 336 in the administrative record and I, and so what you'll want to be doing if you want to take this back is compare administrative record 65, which is where the paragraph Judge Thomas just read appears in the IJ's decision, and you can compare it, for instance, to administrative record page 336, which is the 1997 Department of State profile on asylum claims from Romania. And there, there in that language is the language that the judge was quoting. I know you're already on that, but apparently the IJ herself thought that there was a difference. Would you agree with that assessment? Or are you saying the IJ was wrong? Well, I guess, I guess I would say the IJ was relying on, cited the 1999 report as showing a change and saying here's what happened in 97 and now there is a change. And my position is that the fact she cited is what the IJ thinks, correct? I mean, when you're assessing prejudice, did it make a difference to her? Well, and it doesn't. If the evidence that the IJ is relying on is already in the record, it's not duplicative and it's not unfair if the IJ is, if it's already in the record three times. Are you saying, even though the IJ says, I would have decided this case in CIRCU's favor, but for the 99 report that there's no prejudice because she should have decided it against CIRCU with or without the 99 report? I wouldn't make that argument if the IJ had said that. That's not what the IJ said. The IJ cited a series of six or eight facts that she was noticing from the 99 report. All of them are facts that the Constitution guarantees religious freedom. They're facts that the majority religion is the orthodox religion and 14% are minority religions. So where was the individualized analysis as it applies to Ms. CIRCU? Well, in this case, Your Honor, when her claim of past of communist regime, jailing of her father for being a Pentecostal, and that it was the former communist regime that was religiously persecuting her. My question goes to the comparison of the statements in the country report as applied to her individual situation. Where is that analysis? Well, if her individual, certainly he's not going to be able to point, nor can any immigration judge ever point to a specific discussion of this ailing in the country report. When this court created the requirement of an individualized analysis, what it wanted was, it wanted, it was insisting that if the claim is religious persecution by the government, then there must be an articulated analysis based on a claim of persecution by the government showing that the conditions have changed, which is what this immigration judge was doing in her decision. But she wasn't because she was assuming by the use of the term, however, that things had progressed enough and there was no individualized analysis through CIRCU's opportunity to show on the record with evidence, if she could, that she as a continuing Pentecostal under the conditions outlined in the 1999 report was still at risk, that she individually for whatever circumstances, including her family, being better known than perhaps others. But that's the whole reason for letting the petitioner have the opportunity to draw a factual distinction to herself. That's the individualized analysis. And that's the root problem here, it seems, is that you want us to assume that the BIA made that kind of determination sort of, you know, as part of determining its jurisdiction to streamline and that we should not be able, nor should she be able to look at it as an individualized analysis. I think that's the troublesome problem. Well, it seems you're saying two things and I'll take them backwards at least. As to whether I want you to assume that the board followed its regulations, it's not me, it's the law which says that the board is presumed to follow its own regulations. We have to take that on faith. You have to take that on faith and you can certainly assess this case and see that they're under this law where there was no error and it was no prejudice. But if you don't want to assume that, then of course I suppose one answer is that you do not have an articulated decision by the board here showing why it found no prejudice, showing why it felt that there was no unfair denial of opportunity to rebut and you could remand to the board to articulate that decision as to why it made that decision. Again, with all respect, under the case law of this court, that analysis also merges with what this court's review is, but you can remand it for that articulated decision if you wish. Well, do you agree that the obligation here is to do an analysis as to whether there is persecution with respect to her as a Pentecostal rather than just generally whether there's religious persecution? I think that if there is evidence available that addresses Pentecostals currently and it was submitted by her and in the record, then the IJ could do that. On this record, as the IJ reported in 2007, the country report singled out Pentecostals, perhaps among others, as one that had a difficult time, correct? No. Well, why, doesn't that what the country report says? Actually, what the country report I'm sorry, maybe the IJ misread it, but I'm reading from the IJ's opinion. Yes, thank you. I mean, I don't even know if the IJ misread it. If you look at page 336, which is where it almost is verbatim what the IJ said when he's talking about the 1997 report, page 336 claims based on religion. It's talking about conditions before the revolution and after. It says the revolution brought freedom of religion following decades. Yes. The second sentence says Pentecostals and other unregistered sects in particular had had a difficult time. So it mentioned Pentecostals specifically. During the revolution. During the revolution. Well, now we're back to the situation where the IJ thought it made a difference and what she said is Pentecostal was no longer an adequate ground. It wasn't one of the reasons that I interpret the reports a certain way from before and now I look at the 1999 report differently. So if the IJ is literally upside down in understanding the evidence, isn't that enough by itself given that we have evidence that no one ever got to reflect that it should go back? It can certainly go back. Let me just say if you read the IJ's decision, the fundamental change in country conditions that she's talking about is that all of this past persecution occurred under a repressive communist regime that persecuted all religions. Now the IJ is saying we have country reports and when she quotes the 97 report, that's what it was talking about when it referenced Pentecostals and other religions. It's talking about what was happening during the revolution and certainly that was true. Now the whole thrust of her decision is now we have an entirely new situation and indeed the very 97 report that she is quoting from here goes on to say fortunately the situation has been transformed by the revolution, although it is marred occasionally by unsanctioned harassment by local officials that impedes some worship and proselytizing. One thing that you haven't talked about at all and it has to do with, she, appellants are talking about attorney fees. Did you ever respond to that? Under the Equal Access to Justice Act, it looked like she mentioned it in the opening brief. Well ordinarily what happens is we wait a decision, then they make a motion for attorney fees and then we respond. So that's the reason you haven't responded at this point. Right, because we're not in that posture yet. The thing is, to respond to your last point or to ask a question on your last point, is that the court did, the IJ did mention that there was in the 1997 report a particular incident reported not with regard to Pentecostals but with regard to other Protestant sects. And then she says based on other documentation provided, this one attack was isolated in nature and not a recurring problem in Romania. That says to me two things. First, she understood that the 1997 report didn't say that. And second of all, she got it from someplace. Where'd she get it from? Presumably the 1999 report. Well I don't, I'm not sure we can presume because every time she relied on the 99 report, she cited it and was pretty scrupulous about that. I think she's probably referring to some of the other evidence or country reports. Now, if this court decides at once that what is needed is a remand for articulation, and arguably in that case, updated country reports because of the passage of time, which also can happen on remand. That's one of the things the Supreme Court said could be done in Ventura. You know, again, it's our position that's unnecessary, but we'll be certainly happy to do that, especially given that the current country reports finally document that the Pentecostals are a registered sect and are one of the official religions and have been, so that they're specifically showing that Pentecostals are one of these registered sects and don't have problems. If that, then rebuttal, remand for articulation and supplementing the record to show that is necessary, fine. You know, it won't really matter whether you're happy with it. And it doesn't really matter to me whether the 99 report is or is not subject to a showing that it would make no difference in her case, or that it would. What matters to me, I think, and tell me if there's a different way to read this, is if I understood the IJ right, whether she was right or wrong about the 99 report and its significance, she says, that flipped my decision. Is there a different way to read what the IJ said, other than that the 99 report flipped her decision? I think, frankly, Judge, it was an oversight on her part. The current practice, as my understanding is, that the IJs have with them at the time current country reports when they write decisions. This decision was two years old. The IJ was looking at her reports, and she simply cited that without, meaning that this was a monumental or significant change in country conditions. So, yeah, thank you. Thank you, Your Honors. Very briefly, Your Honors, I think I just want to clarify one thing about there's more than one report floating around about 1997. One of them is what's called a profile of Romania, and that's a card 256 to 269. And that's where they discuss Pentecostals specifically and say that there are instances where they suffer discrimination or harassment by the government. And then we have the country reports on human rights practices, and that's at 333 to 340. Also, with respect to Castillo and the issue of whether or not a motion to remand or a motion to reopen needs to be filed, I think the important thing to note there that the concern of this court and the other courts was that whether or not the alien has exhausted their administrative remedies. That's why the issue of motion to reopen or remand was a concern. In this case, there's no doubt that Ms. Circu exhausted her administrative remedies in a way that is directed by the agency. You made a motion to remand, Senator Evans, and the board did not rule on that. A request to remand, Your Honor, and the reason I... But you made a request and the board didn't rule one way or the other. Yes, Your Honor. And now Arianna says, I doubt it is that. Yes, Your Honor, and the difference, with respect to a motion to remand, that is a discretionary decision. If she would have submitted more evidence, as Judge Kleinfeld pointed out, she would have been taking an issue of constitutional violation and then making it an issue of discretionary grace. And I don't really think that would have been ill-advised for her to do that on appeal to the board. And I have nothing further, Your Honor, so thank you very much. I submit a motion to remand. I move that Ms. Hardy be removed from the pleas at the Booth Supreme Court's College of Justice for a stand-by vote. All rise. Hear ye, hear ye. All those having had business before this honorable court in the United States Court of Appeals for the Ninth Circuit shall now depart. The court is adjourned.
judges: Schroeder, Pregerson, Rymer, Kleinfeld, Thomas, Silverman, McKeown, Fisher, Berzon, Rawlinson, Callahan